J-S17030-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF: T.S., A MINOR

APPEAL OF: T.J.S., NATURAL FATHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1919 WDA 2014

Appeal from the Order entered October 29, 2014,
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No(s): TPR 14-00132

BEFORE:  GANTMAN, P.J., SHOGAN, and FITZGERALD*, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED APRIL 24, 2015**

T.J.S. ("Father") appeals from the orphans' court order entered on October 29, 2014, granting the petition filed by Allegheny County Children Youth and Families ("CYF" or the "agency"), to involuntarily terminate Father's parental rights to T.S. ("Child").[1]  We affirm.

The orphans' court accurately set forth the factual background and procedural history in its opinion entered on December 19, 2014, which incorporated factual findings from its October 29, 2014 order terminating Father's parental rights.  We adopt the orphans' court's factual findings, and set forth only as much of the factual background and procedural history as is necessary to our disposition of this appeal.

_____

* Former Justice specially assigned to the Superior Court.

[1]  On October 29, 2014, the orphans' court entered an order involuntarily terminating the parental rights of Child's mother, S.Y. ("Mother").  Mother did not file a notice of appeal from the order terminating her parental rights, nor is she a party to the instant appeal.

1. [Child] was born [in April of 2011]; he is 3 years old. [S.Y.] is the biological mother of [Child]. [T.J.S.] is [Child's] father. Paternity is established as [F]ather signed an acknowledgment of paternity.

2. [Child] was removed from the care of his parents on April 22, 2012. He was adjudicated dependent on May 30, 2012.

3. On May 30, 2012, [the orphans' court] entered the following findings of fact in support of the adjudication of dependency. (*See* Order of Adjudication & Disposition, contained within CYF Exhibit [3])[.]

   a. On April 20, 2012[,] Pittsburgh Police were called to the Pleasant Valley Shelter for an infant with a burn. When the police responded, they observed a "large blister" on the child's left index finger.

   b. Mother told the police that [Child] was burned by a candle when he put his finger into it. Mother explained that the electricity had been shut off and she was using candles as a result. See CYF exhibit 3 – photo of the child's injured finger.

   c. [Child] was taken to Allegheny General Hospital[,] where he was diagnosed with a second degree burn to his left index finger and required further medical attention.

   d. [Child] also received [a] complete medical examination, including a skeletal survey. The skeletal survey revealed healing fractures to the 9th and 10th rib and an elbow joint diffusion. Elbow joint diffusions most commonly occur as a result of an injury or arthritis. There was no fracture to the elbow. In the opinion of Dr. Richard Daffner, the rib fractures were "months old" and highly suspicious for accidental injury due to the location of the fractures and because rib fractures are rare in children. As a result, Dr. Daffner [] concluded that the injuries to the ribs were most likely inflicted as a result of child abuse. The child would have experienced severe pain at the time of the injury.

   e. [Child] was transported to West Penn Hospital for treatment of his burn wound. He was examined by Dr.

Ariel Abally, burn surgeon, on April 21, 2012. Dr. Abally found a second degree burn on the left index finger. Dr. Abally stated that the burn occurred within days prior to examination but could not give an exact time. He could not give the cause. He testified that a flame burn could occur in a very short period of time. Blistering should occur in 2 to 3 hours. [Child] will recover completely. He will not have a scar or other lasting effects.

f. Other than the broken ribs, the joint diffusion, and the burn, [Child] was and is in good health.

g. Mother told the caseworker that [Child's] hand had moved over a burning candle while having his diaper changed and reports treating the area with first aide cream. Mother denied seeing a blister. Mother was unable to explain the old rib fractures and joint diffusion.

h. CYF implemented crisis services on April 20, 2012[,] upon completion of a home assessment where it was found that the home was without electricity.

i. Mother initially denied the domestic violence in the home but subsequently acknowledged that [F]ather assaulted her the evening of April 20, 2012, which resulted in a black eye to the left side of her face. Mother said she went to West Penn emergency room for treatment[,] and was diagnosed with a broken nose and other facial fractures. Father was arrested and charged with two counts of aggravated assault, disorderly conduct, endangering the welfare of another person, and resisting arrest. See CYF Exhibit 4 – photo of [M]other's black eye.

\* \* \*

m. Father also acknowledged a history of drug abuse and mental health diagnosis including intermittent explosive disorder and bipolar disorder. Father received treatment through TADISO. Father began methadone maintenance on 3/26/12. He was non-compliant with treatment and made no progress. [H]e was discharged AMA [Against Medical Advice] when he stopped coming. No aftercare plan was developed. See CYF Exhibit 5.

\* \* \*

4. [The orphans' court] also found that [Child] was a victim of child abuse, but that the perpetrator was unknown.

5. [Child] has significant behavioral issues. He has been expelled from two day care programs. He currently attends the Mathilda Theiss Therapeutic Pre-School Program.

6. [Child] is placed in the foster home of [M.C. and D.C.]. He has been in this home since his initial removal. He has remained in care and has never been returned to the care of either parent.

7. Both [M]other and [F]ather have substantial criminal histories. *See* CYF Exhibits 1 and 2.

Orphans' Court Opinion, 12/19/14, Exhibit "A" at 1-3.

On July 18, 2014, CYF filed a petition to involuntarily terminate the parental rights of Mother and Father pursuant to Sections 2511(a)(2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101–2938. On October 29, 2014, the orphans' court held a hearing on the termination petition. Father was present at the hearing and was represented by counsel. CYF presented the testimony of Valerie Johnson, the CYF caseworker supervisor assigned to the case since June 11, 2012. N.T., 10/29/14, at 8–104. Neil D. Rosenblum, Ph.D., a licensed psychologist who evaluated Father on five occasions, testified as an expert for CYF. *Id.* at 105–137. Father, who was incarcerated, testified on his own behalf. *Id.* at 139–157. Finally, Father presented the testimony of his mother, Child's paternal grandmother. *Id.* at 158–160. Both CYF and Father presented several exhibits, which were

admitted into evidence. At the conclusion of the hearing, the trial court terminated Father's parental rights. *Id*. at 174.

On November 26, 2014, Father timely filed a notice of appeal, raising the following issues:

A. Did the Trial Court abuse its discretion and err in determining that the termination of Father's parental rights would best serve the needs and welfare of [Child][?]

B. Did the Trial Court abuse its discretion and err in finding by clear and convincing evidence that [Child] would not be adversely affected by severance of the strong bond extant between [Father] and [Child]?

C. Did the Trial Court [] abuse its discretion and err as a matter of law in determining that reunification with Father was no longer viable when Father had clearly shown his ability to parent and care for [Child]?

D. Did the Trial Court abuse its discretion and err as a matter of law in determining that due to Father's history of intermittent incarceration there exists only a minimal bond with [F]ather?

E. Did the trial court abuse its discretion and err as a matter of law in determining that there was clear and convincing evidence that it was and is nearly impossible for Father to maintain or improve the parent/child relationship between Father and [C]hild?

F. Did the trial court abuse its discretion and err as a matter of law in determining that there was clear and convincing evidence that grounds for termination clearly exist as to [F]ather when contradictory and erroneous testimony was offered by the same witness?

G. Did the trial court abuse its discretion and err as a matter of law in determining that parental rights should be terminated when a less restrictive option of Subsidized Permanent Legal Custodianship was available?

[H.] Did the trial court abuse its discretion and err as a matter of law in determining that termination of Father's parental rights was in the best interests of [Child] when [Child] is clearly bonded to[Father][?]

Father's Brief at 6–7.

In reviewing an appeal from the termination of parental rights, we employ the following standard:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(2), (5), (8) and (b), and made the following factual findings to support its termination decision:

8. CYF established a family service plan [("FSP")], which included the following goals for [M]other and [F]ather: to achieve and maintain sobriety; to address issues of domestic violence and abuse; to acquire parenting skills to enable them to meet the medical, educational, and emotional needs of [Child]; to engage in mental health treatment and achieve mental health stability; to obtain stable housing; [and] to consistently attend visitation with [Child] to continue and improve the parent/child

bond. CYF offered both parents a myriad of services to assist them with achieving [these] goals.

\* \* \*

12. With respect to [F]ather, for much of the time[,] [F]ather was compliant with his FSP goals. He consistently visited his son. He attended court hearings. He maintained contact with the caseworker and his attorney. He engaged in and completed domestic violence counseling through the Domestic [Abuse] Counseling Center (DACC). He participated in and completed a parenting program. He obtained his GED. For a significant period, he was sober. As a result of [F]ather's compliance and progress[,] it appeared that reunification with [F]ather was viable.

13. Father was unable to sustain this level of stability, however. In June of 2013, [F]ather was arrested for public drunkenness. At the January 2014 permanency hearing, the court found as follows.

a. Father was referred to in-home services through Family Resources to work on parenting skills, and to connect him to community services including individual therapy. Family Resources' services closed due to [F]ather's lack of cooperation.

b. Father was scheduled to attend Family Resources for evaluation and individual therapy; however[,] he did not attend [the] intake appointment. Father also scheduled an individual mental health therapy appointment at Turtle Creek MH/MR but failed to follow through with that appointment.

c. The caseworker sent information to [F]ather regarding attending mental health and drug and alcohol treatment. The resource guide sent to [F]ather has contact information for multiple drug and alcohol and mental [health] treatment facilities. Father is not known to be enrolled in any D&A or MH treatment at this time.

d. Father has been referred to OCYF Conferencing and Teaming. A Conference was held on 6/24/13 and a follow[-]up Teaming Meeting was held on 11/22/13. At

the meeting, the importance of attending D&A and MH [treatment] was discussed with [F]ather.

e. Father is not known to be attending therapy or D&A treatment at this time.

f. The caseworker scheduled drug screens for [F]ather bi-weekly. Father has missed multiple scheduled screens.

g. Father was referred to Urban League to assist him with housing. Father is not known to have located housing at this time.

h. Father is visiting with [Child], supervised by [P]aternal [G]randmother at her home. Father cooperated only partially with in-home services[,] and services were cancelled. Father was referred to individual therapy through Family Resources and Turtle Creek MH/MR [Mental Health/Mental Retardation], though he did not attend either evaluation.

i. OCYF provides [F]ather with a monthly bus pass for meetings, appointments and visitation with [Child]. (*See* Order entered on January 21, 2014, contained within CYF Exhibit 3.)

14. On March 29, 2014, [F]ather was arrested and subsequently incarcerated in the Allegheny County Jail on charges of identity theft, false ID to law enforcement, simple assault, terroristic threats, harassment, public drunkenness, and disorderly conduct. [Child] was present [] when [F]ather was arrested.

15. At the April 2014[] permanency hearing, the court entered the following findings.

a. Father has had overnight/weekend visitation with [Child], supervised by [P]aternal [G]randmother at her home.

b. Father cooperated only partially with in-home services[,] and services were cancelled.

c. [Father] was referred to in-home services through Family Resources to work on parenting skills, and to connect him to community services including individual therapy. Family Resources services closed due to [F]ather's lack of cooperation.

d. Father was scheduled to attend Family Resources for evaluation and individual therapy; however[,] he did not attend [the] intake appointment.

e. Father also scheduled an individual mental health therapy appointment at Turtle Creek MH/MR[,] but failed to follow through with that appointment.

[f.] A follow[-]up Teaming Meeting was held on 11/22/13. At the meeting, the importance of attending D&A and MH [treatment] was discussed with [F]ather. Father is not known to be attending [MH] therapy or D&A treatment at this time. The caseworker scheduled drug screens for [F]ather bi-weekly. Father has missed multiple scheduled screens. He tested positive for suboxone in February [of 2014]. (*See* order entered on April 2, 2014, contained within CYF exhibit 3.)

16. On August 5, 2014, [F]ather was involved in an altercation with [M]other[,] and was stabbed in the head by [Mother's] paramour.

17. Father is currently incarcerated in the Allegheny County Jail.

18. Dr. Rosenblum completed evaluations in this case on: July 12, 2012; September 12, 2012; May 29, 2013; January 1, 9, and 29, 2014; May 5, 2014; and October 21, 2014. These evaluations included individual evaluations of [M]other and [F]ather[,] and interactional evaluations of [Child] with [M]other, [F]ather, foster parents, and [P]aternal [G]randmother.

19. Based upon the evaluations, observations and opinions of Dr. Rosenblum, [the orphans' court found] that neither parent is capable of safely parenting and meeting the needs of [Child] on a daily basis. Both [M]other and [F]ather are unstable. [The orphans' court] also [found] that [Child's] primary bond is with his foster parents[,] with whom he has resided for most of his

life. [Child], who is 42 months old, has been in care for 30 months or for 71% of his life.

20. [The orphans' court] also [found] that due to the length of time in care, that [Child] has no real bond with [Mother] and has only a minimal bond with [Father]. Mother's and [F]ather's consistent incarceration has made it nearly impossible to maintain or improve the parent/child relationship.

21. Additionally, the constant incarceration of both [M]other and [F]ather establishes that they have not achieved the stability and commitment necessary to meet the needs of [Child].

22. [Child] has behavioral concerns that require stable parenting and continued services, which he is currently receiving. [The orphans' court found] that removal from this environment would be contrary to the welfare of [Child] and perhaps harmful.

23. CYF has clearly proven that grounds for termination of parental rights [exists] as to both [M]other and [F]ather.

24. [Child] has been in care for most of his life. He deserves to remain in a permanent and nurturing environment. Permanence is critical to his well-being. To make him wait for [M]other or [F]ather to resolve their criminal issues and acquire the necessary stability to parent him would be a great injustice. CYF has clearly proven that termination of parental rights best serves the needs and welfare of [Child].

Orphans' Court Opinion, 12/19/14, Exhibit "A" at 3–6.

In *In Re Adoption of C.D.R.*, ___ A.3d ___, 2015 PA Super 54 (Pa. Super. 2015) (filed March 17, 2015), we explained that termination of parental rights under Section 2511 requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants

- 10 -

termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id*. at *2 (quoting ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted)).

This Court may affirm the orphans' court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a).[2] ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will analyze the court's decision to terminate under sections 2511(a)(2) and (b), which provide as follows:

### § 2511. Grounds for involuntary termination

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

---

[2] In its brief, CYF asserts that it proved by clear and convincing evidence that Father's parental rights were rightly terminated pursuant to 23 Pa.C.S. § 2511(a)(8), which authorizes termination when:

(8) The child has been removed from the care of the parent or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8). However, because the orphans' court did not specifically address termination under subsection 8, we will confine our discussion to termination under 23 Pa.C.S. § 2511(a)(2) and (b).

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To satisfy the requirements of section 2511(a)(2), the party seeking termination must produce clear and convincing evidence regarding the following elements:

(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "'The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not

- 12 -

limited to affirmative misconduct. To the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties.'" *In re C.D.R.*, slip op. at *3 (quoting *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002)).

Although the majority of Father's appellate argument focuses on whether termination of his parental rights best served the needs and welfare of Child, *see* Father's Statement of Questions Involved, A, B, D, G, H, he also contends that the orphans' court erred in terminating his rights under section 2511(a)(2) because, despite his incarcerations, reunification with Child remained a viable option. Father also submits that there was no evidence presented that he could not maintain or improve his relationship with Child and criticizes the CYF caseworker's testimony concerning his participation and completion of certain programs, describing her statements as erroneous and contradictory. *See* Father's Statement of Questions Involved, C, E, and F. We interpret these arguments as a challenge to the court's finding that Father was unable to maintain the level of stability that he had demonstrated at earlier permanency reviews in 2012 and 2013.

Our review of the record reveals that [Child] was removed from his parents' care shortly before his first birthday, due to child abuse by an unnamed perpetrator, Mother's admitted drug abuse, domestic violence between Mother and Father, and Father's drug abuse and mental health diagnosis that included intermittent explosive disorder and bipolar disorder.

- 13 -

CYF Ex. 3. Order of Adjudication and Disposition–Child Dependent, May 30, 2012. While Father was initially compliant with the goals stated in the permanency plans associated with this case, after Father's arrest in June 2013 for public drunkenness, he was unable to sustain his progress. The orphans' court detailed that the in-home services tasked with helping Father to improve his parenting skills were closed due to Father's lack of cooperation. Father did not appear for evaluation and individual therapy appointments, and was not known to enroll in or seek any court-recommended drug and alcohol or mental health treatment.[3] Additionally, Father missed multiple drug screens, and did not obtain independent housing. The court also noted that Father was arrested again on March 29, 2014, in the presence of Child, and on August 5, 2014, was involved in an altercation with Mother when he was stabbed in the head by Mother's paramour. Orphans' Court Opinion, 12/19/14, Exhibit A, at 4–5.

Based on the foregoing evidence, we conclude that the orphans' court appropriately considered Father's incarcerations in addressing the evidence offered to support the termination of his parental rights. While Father is correct that incarceration of a parent, standing alone, cannot constitute

---

[3] At the termination hearing, Father represented that he was receiving dual counseling services from a licensed social worker. He stated that he provided CYF with the therapist's business card and signed a release "for attendance records only, because I don't feel it's [CYF's] business to know what I'm talking about." N.T., 10/29/14, at 143. The CYF caseworker testified that the agency did not receive any confirmation of Father's treatment with that therapist. *Id*. at 31, 52.

proper grounds for the termination of that parent's rights to his child, *see In re R.I.S.*, 36 A.3d 567, 574 (Pa. 2011), the Pennsylvania Supreme Court has also observed that incarceration can be a determinative factor in a court's conclusion that grounds for termination exist under 23 Pa.C.S. § 2511(a)(2) where the parent's incarceration has caused the child to be without essential parental care, control or subsistence. *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012). Here, Father's continued incarcerations, along with his failure to keep scheduled appointments for evaluation and individual therapy, his mental health issues, his limited cooperation with in-home services, his non-compliance with scheduled drug screenings, his continued conflict with Mother, and his inability to secure housing all demonstrate acts of refusal and incapacity to provide Child with essential parental care or control.

Additionally, Father's unbalanced behavior and continued incarcerations argue against Father's contention that he could maintain or improve his relationship with Child. We do not agree with Father that no evidence on this subject was presented at the termination hearing as the testimony of CYF's witnesses and CYF exhibits confirmed that, after Father's June 2013 arrest, he expended minimal effort to assume his parental obligations. *See In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002) (citation omitted) (parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities). Although

Father testified that he had completed parenting and domestic violence programs in 2013, the evidence shows that Father's compliance with court-recommended therapy and cooperation with in-house services to improve parenting skills spiraled downward after Father's June 2013 arrest. Other than continuing visits with Child, nothing in Father's behavior after that point established that he was able to maintain or improve his relationship with Child.

Father's final argument on the section 2511(a)(2) prong of the termination inquiry is that the orphans' court erred in finding that CYF presented sufficient evidence to support termination of his parental rights because the CYS caseworker's testimony was either erroneous or contradictory. While Father correctly states that the caseworker initially misspoke about specific dates related to Father's incarcerations and Father's participation in and completion of domestic violence classes, the information on these subjects was later sufficiently clarified. Indeed, the orphans' court found that Father did complete parenting and domestic violence programs. Orphans' Court Opinion, 12/19/14, Exhibit A, at ¶ 12. Furthermore, the orphans' court, as the finder of fact, is the sole determiner of the credibility of witnesses, and it is within that court's province to resolve all conflicts in testimony. *In re B.C.*, 36 A.3d 601, 605 (Pa. Super. 2012). In accord with our deference to the fact-finding court as the determiner of the credibility of witnesses, we cannot conclude that the orphans' court erred in accepting the

caseworker's testimony because of the rather inconsequential discrepancies in her statements. *See In re E.M.I.*, 57 A.3d 1278, 1284 (Pa. Super. 2012) (fact-finder is sole and final arbiter of conflicts in evidence).

Our review of the record supports the orphans' court decision that Father is incapable of parenting Child and has left Child without essential parental care or control. Although Father was initially very motivated to work towards reunification with Child, since Father's June 2013 arrest, he regressed dramatically. We agree with the orphans' court that for the two and one-half years that Child has been in foster care, Father, by virtue of his incarcerations and resistance to participation in programs designed to improve his mental health and parenting skills, cannot meet the parental needs of Child. Father has shown a continued inability to parent Child, leaving Child without Father's essential care. Additionally, Father has not taken measured steps to remedy his inability to parent. We thus conclude that the orphans' court did not err or abuse its discretion in terminating Father's parental rights under 23 Pa.C.S. § 2511(a)(2).

As we determined that the requirements of section 2511(a)(2) have been met, we proceed to review whether the mandates of section 2511(b) are satisfied. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008–1009 (Pa. Super. 2008) (*en banc*). This Court has stated that while the focus in terminating parental rights under section 2511(a) is on the parent, we evaluate the child's interests in a section 2511(b) analysis. *Id.* at 1008.

Evidence in support of termination under section 2511(b) should be analyzed as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). We have held that while a parent's emotional bond with his or her child is an integral component of a subsection 2511(b) analysis, it is only one factor to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.–S.,* 958 A.2d 529, 535–536 (Pa. Super. 2008). Additionally, the mere presence of an emotional bond does not prevent the termination of parental rights when the parent is unable to serve the needs of the child. *In re T.D.,* 949 A.2d 910, 923 (Pa. Super. 2008). "Rather, the trial court must examine the status of the bond to determine whether its termination 'would destroy an existing, necessary and beneficial relationship.'" *In re A.D.*, 93 A.3d 888, 897–898 (Pa. Super. 2014) (quoting *In re Adoption of T.B.B.,* 835 A.2d 387, 397 (Pa. Super. 2003)).

Here, the orphans' court appropriately considered that Child's primary bond is with his foster parents, with whom he has resided since he was one year old. *See In re T.S.M.*, 71 A.3d 251 at 268 (courts must determine whether child has bond with foster parent). Child, forty-two months old at the time of the termination hearing, had been in care for thirty months, seventy-one percent of his life. Orphans' Court Opinion, 12/19/14, Exhibit A, ¶ 19. The orphans' court also found that, due to the length of his time in care, Child had only a minimal bond with Father as his consistent incarceration made it nearly impossible to maintain or improve the parent/child relationship. *Id*. at ¶ 20. The court observed that Child's behavioral problems required the stable parenting and continued services that he was receiving in foster care and that removing Child from this stable "environment would be contrary to the welfare of [Child] and perhaps harmful." *Id*. at ¶ 22.

In closing its needs and welfare analysis, the orphans' court declared that Child "deserves to remain in a permanent and nurturing environment. Permanence is critical to his well-being. To make [Child] wait for . . . [F]ather to resolve [his] criminal issues and acquire the necessary stability to parent [Child] would be a great injustice." Orphans' Court Opinion, 12/19/14, Exhibit A, at ¶ 25. The orphans' court thus concluded that "CYF has clearly proven that termination of [Father's] parental rights best serves the needs and welfare of [Child]." *Id*.

With respect to subsection 2511(b), Father raises four separate issues which can be condensed to an argument that clear and convincing evidence does not support the orphans' court needs and welfare of the child analysis. Specifically, Father alleges that the court did not adequately consider un-contradicted evidence of the apparent bond between Father and Child or determine the extent of the harm that would befall Child if the bond was severed.

Again, we conclude that the record supports the orphans' court decision to terminate Father's parental rights. In fairness to Father, the record supports his assertion that he loves Child. The CYS caseworker acknowledged that Father loves Child, that Child has a bond with Father, and responds positively to him. N.T., 10/29/14, at 86. Dr. Rosenblum, the psychologist who conducted evaluations of the family, agreed that Father loves Child and will offer Child praise and affection, but, he also described times when Father was passive in his interaction with Child. *Id.* at 114-115. Dr. Rosenblum described the dynamic between Father and Child as a "mixed relationship," explaining that Child requires people to work hard to engage him and emotionally involve him. *Id.* at 115-116, 120. On the other hand, Dr. Rosenblum testified that Child has a positive bond with his foster parents, who wish to adopt him into their family. *Id*. at 116, 110. The psychologist described Child's foster mother as doing "an excellent job of interacting with [Child], recognizes [Child's] developmental skills, and

provide[s] him with a very stable, secure relationship." *Id*. at 109. Dr. Rosenblum concluded his assessment by averring that Father had not moved forward with his ability to provide for Child's needs and welfare and questioned Father's motivation to change. *Id.* at 122–123. Finally, and contrary to Father's claim that Dr. Rosenblum did not address the effect of severing the bond of Father with Child, Dr. Rosenblum opined that Child would not be harmed if Father's parental rights were terminated. *Id.*

There is clear and convincing evidence in the record to support the orphans' court's determination that Child's foster parents meet all of Child's needs and welfare and that Child's bond with Father is minimal, such that, if the bond between Child and Father was severed, Child would not suffer harm. Further, the record supports the orphans' court's determination that the termination of Father's parental rights would serve Child's best interests. With all of the requirements of termination of parental rights met under sections 2511(a)(2) and (b), there is no need to address Father's argument concerning the orphans' court's failure to consider a Subsidized Permanent Legal Custodianship.[4]

Accordingly, we affirm the orphans' court's order terminating Father's parental rights to Child pursuant to sections 2511(a)(2) and (b) of the Adoption Act.

_____

[4] Furthermore, Dr. Rosenblum expressly rejected permanent legal custodianship as an alternative as it would not meet Child's needs as well as adoption. N.T., 10/29/14, at 129–130, 136.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/24/2015